**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 9:24-cv-80173-Leibowitz/McCabe**

APR ENERGY, LLC, and NEW APR
ENERGY, LLC,

      Plaintiffs,

vs.

AMERICAN POWER HOLDINGS, LLC,
AMERICAN POWER RESOURCES LLC,
AMERICAN POWER REALTY LLC,
APR RENEWABLES LLC, APR GREEN
ASSETS LLC, APR GREEN DATA LLC,
and BENJAMIN CHURCH,

      Defendants.

_____/

**<u>VERIFIED AMENDED COMPLAINT</u>**

    Plaintiffs, APR Energy, LLC ("APR Energy") and New APR Energy, LLC ("New APR" and collectively "Plaintiffs") sue Defendants, American Power Holdings, LLC, American Power Resources LLC, American Power Realty LLC, APR Renewables LLC, APR Green Assets LLC, and APR Green Data LLC (together, "American Power Entities"), and Benjamin Church, individually, ("Ben Church" or "Church"), and allege:

**I.      NATURE OF ACTION**

    1.    This is an action by Plaintiffs against the American Power Entities and Ben Church (together, "Defendants").

    2.    Plaintiffs seek damages from (1) Defendants' trademark infringement, unfair competition, and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), *et seq.*, trademark infringement and unfair competition under 15 U.S.C. § 1114(a), *et seq.*, trademark

infringement and unfair competition under Florida common law; (2) Ben Church's breaches of his fiduciary duties to APR Energy and its members, unjust enrichment, and fraudulent misrepresentations; (3) the American Power Entities' aiding and abetting Church's breach of his fiduciary duties to APR Energy and its members; and (4) the American Power Entities' violations of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), *et seq.*

3.       Plaintiffs seek temporary and permanent injunctive relief because Plaintiffs have suffered and will continue to suffer serious, substantial, and irreparable injury unless Defendants are enjoined.

4.       Plaintiffs also seek, pursuant to the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(C), either the transfer of the domain names apr.energy, aprenew.com, and any other domain name beginning with "apr" from the American Power Entities to Plaintiffs, or the forfeiture or cancellation the American Power Entities' registration, ownership, and use of such domain names.

## II.       PARTIES

5.       Plaintiff, APR Energy, is a limited liability company organized and existing under the laws of the State of Florida. Its principal place of business is located at 4600 Touchton Road, Building 100, Suite 500, Jacksonville, FL 32246. Atlas Corp. is the ultimate parent company of APR Energy and its affiliates.

6.       Plaintiff, New APR, is a limited liability company organized and existing under the laws of the State of Delaware.  Its principal place of business is located at 7660 Centurion Parkway, Suite 100, Jacksonville, Florida.  New APR acquired certain assets of APR Energy in a transaction that closed on December 31, 2024, including the APR Energy trademarks.  New APR and APR

Energy have entered into a limited licensing agreement, whereby New APR authorized APR Energy the continued limited use of the APR Energy trademarks.

7.      American Power Holdings, LLC is a limited liability company organized and existing under the laws of the State of Florida. Its principal place of business is located at 2000 PGA Blvd., Suite 4440, Palm Beach Gardens, FL 33408.

8.      American Power Resources LLC is a limited liability company organized and existing under the laws of the State of Florida. Its principal place of business is located at 2000 PGA Blvd., Suite 4440, Palm Beach Gardens, FL 33408.

9.      American Power Realty LLC is a limited liability company organized and existing under the laws of the State of Florida. Its principal place of business is located at 2000 PGA Blvd., Suite 4440, Palm Beach Gardens, FL 33408.

10.     APR Renewables LLC is a limited liability company organized and existing under the laws of the State of Florida. Its principal place of business is located at 2000 PGA Blvd., Suite 4440, Palm Beach Gardens, FL 33408.

11.     APR Green Assets LLC is a limited liability company organized and existing under the laws of the State of Florida. Its principal place of business is located at 2000 PGA Blvd., Suite 4440, Palm Beach Gardens, FL 33408.

12.     APR Green Data LLC is a limited liability company organized and existing under the laws of the State of Florida. Its principal place of business is located at 2000 PGA Blvd., Suite 4440, Palm Beach Gardens, FL 33408.

12.     Ben Church is a natural person over the age of 21 and is otherwise *sui juris*. Church is domiciled in the State of Florida and resides in Martin County, Florida.

### III.   JURISDICTION AND VENUE

14.     This action is brought pursuant to various federal and state statutes, including the Lanham Act, 15 U.S.C. § 1051 *et seq.* and Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), *et seq.*  This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338(a)–(b), 15 U.S.C. § 1121, and 18 U.S.C. § 1836(c).

15.     This Court also has supplemental jurisdiction over the state law claims raised below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein form part of the same case or controversy as the claims over which the Court has federal question subject-matter jurisdiction.

16.     This Court has personal jurisdiction over the American Power Entities. The Court may exercise general jurisdiction over the American Power Entities because each of the American Power Entities was formed in Florida and has its principal place of business in Florida. The Court may also exercise specific jurisdiction over the American Power Entities because Plaintiffs' claims arise out of, and relate to, those Defendants' activities within the State of Florida. The Florida Long Arm Statute, specifically Florida Statutes Sections 48.193(1)(a)(1)–(2) authorizes the exercise of jurisdiction over each of the American Power Entities because Plaintiffs' claims against the American Power Entities arise from the American Power Entities' "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state," and "[c]ommitting a tortious act within this state." The Florida Long Arm Statute, specifically Florida Statutes Section 48.193(1)(a)(2), also authorizes the exercise of jurisdiction over the American Power Entities because they are "engaged in substantial and not isolated activity within" the State of Florida.

17.     This Court has personal jurisdiction over Ben Church. The Court may exercise general jurisdiction over Church because he is a resident of, and domiciled in, in the State of

Florida. The Court may also exercise specific jurisdiction over Church because APR Energy's claims arise out of, and relate to, Church's activities within the State of Florida. The Florida Long Arm Statute, specifically Florida Statutes Sections 48.193(1)(a)(1)–(2), (7), and (9) authorizes the exercise of jurisdiction over Church because Plaintiffs' claims against Church arise from his "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state," "[c]ommitting a tortious act within this state," "[b]reaching a contract in this state by failing to perform acts required by the contract to be performed in this state," and "[e]ntering into a contract that complies with [Florida Statutes Section] 685.102." The Florida Long Arm Statute, specifically Florida Statutes Section 48.193(1)(a)(2), also authorizes the exercise of jurisdiction over Church because he is "engaged in substantial and not isolated activity within" the State of Florida.

19.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)–(c) because Defendants are residents of Florida and reside within this district, Defendants are subject to personal jurisdiction in this judicial district, Defendants' contacts with this district are regular and purposeful, and a substantial part of the events or omissions giving rise to the claims in this action arose or occurred in this district.

### IV.     FACTUAL BACKGROUND

#### A.     *Plaintiffs Assist Clients in Generating Electricity and Compete in the Market for Electricity Generation and Utility Services.*

20.     Plaintiffs operate and compete in the market for electricity generation and utility services. Customers in the market for electricity generation and utility services have multiple options for securing a supply of electricity.

21.     Plaintiffs offer customers mobile gas turbine fleets, which they deploy to meet customers' electricity-generation needs. Plaintiffs also are capable of offering photovoltaic and

wind power solutions to meet customers' electricity-generation needs.  Plaintiffs also have plans to offer hydrogen energy solutions as part of their product offerings.

22.     Gas turbine fleets, photovoltaic, hydrogen, and wind solutions are among many technologies from which customers may choose for electrification. In economic terms, photovoltaic, hydrogen, gas turbine, and wind solutions are substitute goods that are part of the same product market for competition purposes because they have positive cross elasticities of demand.

23.     Plaintiffs have developed capacity and expertise to build, deploy, and manage photovoltaic and wind energy solutions and plans to offer hydrogen energy solutions as part of its product offerings.  They also have, among its key strategic goals, the objective of growing its photovoltaic, wind, and hydrogen renewable operations so that they may expand their suite of product offerings to customers in the market for electricity generation and utility services.

24.     Plaintiffs also offer battery and power-storage solutions.

25.     New APR is a venture engaged in the power generation business in the United States that acquired certain assets of APR Energy, including the APR Energy trademarks and all the goodwill associated with them, as well as APR Energy's domain names.

26.     New APR uses and will continue to use the APR Energy trademarks, including the name "APR," on or in connection with the advertising, promotion, and sale of New APR's goods and services.

27.     During his tenure as Chief Executive Officer of APR Energy, Church played a key role in promoting, designing, and furthering APR Energy's goal of expanding and developing its product suite of electrification options to include renewable options including photovoltaic, wind, and hydrogen power solutions.

**B.      *APR Energy Hired Defendant Ben Church as Its New CEO in the Summer of 2021.***

28.      In the summer of 2021, APR Energy hired Ben Church to be its new Chief Executive Officer.  Church accepted APR Energy's offer to be its new CEO on July 16, 2021. Church's start date at the company was August 9, 2021.

29.      As APR Energy's CEO, Ben Church occupied a position of ultimate trust, confidence, and authority. He was the highest-ranking executive at APR Energy and reported directly to Mr. Bing Chen, the President and CEO of Atlas Corp., the ultimate parent company of APR Energy and its affiliates. Among his duties, Ben Church was responsible for:

- creating and implementing APR Energy's strategic goals, including, but not limited to the company's highly confidential strategic growth plans and long-term business strategy and highly confidential strategic plans for gaining market share in target geographic and industrial markets;
- expanding APR Energy's suite of product offerings to include renewable energy solutions;
- protecting and enhancing company culture;
- ensuring operational excellence;
- managing deal risks;
- cultivating stronger relationships with existing customers;
- gaining the trust and business of potential customers;
- ensuring customer satisfaction with APR Energy's deliverables;
- allocating capital and resources;
- hiring senior leadership and improving employee trust and retention;
- achieving the company's highly confidential financial targets, including on revenue, EBITDA, and other metrics;
- protecting the company's intellectual property and confidential and proprietary information.

30.      As APR Energy's CEO, Ben Church gained access to APR Energy's highly confidential and proprietary information.  This information was non-public and provided APR Energy with significant competitive advantages. APR Energy's confidential and proprietary information included its pricing models, costing models, long-term joint venture and merger and acquisition strategies, long-term joint venture and merger and acquisition plans and targets, lists of potential and current customers, term sheets, counterparty lists and names, and asset

configurations. This information derived independent economic value due to being neither generally known nor readily ascertainable through proper means by others who could obtain economic value from the disclosure or use of this information. APR Energy complied each of these from non-public information. APR Energy took, and continues to take, reasonable measures to keep secret its highly confidential and proprietary information by measures including, but not limited to, ensuring that this information was available to only employees whose access was appropriate and necessary for the performance of their roles at APR Energy and ensuring that employees would be bound to restrictive covenants, including, but not limited to, promises to ensure the security and secrecy of the information constituting this confidential and proprietary information. Ben Church, as the Chief Executive Officer of APR Energy, had access to APR Energy's highly confidential and proprietary information and the availability of this information to him was appropriate given the nature of his role and responsibilities.

31.     APR Energy's pricing and costing models constitute proprietary and highly confidential information that would be extremely damaging to APR Energy if it fell into a competitor's hands. That information constitutes the means by which APR Energy determines and evaluates the costs of projects and how they should be priced. A competitor armed with this information would be able to bid and compete more effectively against APR Energy for future work, as it would be aware of how APR Energy would view costs on projects and price and bid for them.

32.     APR Energy's long-term joint venture and merger and acquisition strategies and long-term joint venture and merger and acquisition plans and targets constitute proprietary and highly confidential information that would be extremely damaging to APR Energy should it fall into a competitor's hands. That information constitutes the means by which APR Energy identifies

potential acquisition targets and partners and evaluates the suitability of an acquisition or joint venture. APR Energy's joint venture and merger and acquisition strategies and long-term joint venture and merger and acquisition plans and targets also reveal APR Energy's analysis of marketplace dynamics, including the company's view of manufacturers or service suppliers, geographic areas, participants in those spaces, and whether those manufacturers, service suppliers, geographic markets offer profitable expansion opportunities. A competitor armed with this information would be able to insert itself into APR Energy's acquisition or joint-venture processes, more easily locate alternative partners to compete with APR Energy, more easily insert itself into geographic markets, and otherwise undermine APR Energy's returns from investment.

33.     APR Energy's term sheets and counterparty names and lists constitute proprietary and highly confidential information that would be extremely damaging to APR Energy should it fall into a competitor's hands. That information constitutes and reflects APR Energy's counterparties, evaluation of counterparties, evaluation of contemplated transactions, and value of contemplated transactions. Acquiring APR Energy's term sheets or counterparty names and lists would give a competitor the opportunity to approach parties in which APR Energy was in preliminary discussions, allow a competitor to disrupt APR Energy's development or work with third parties, and give a competitor an unearned and wrongful ability to compete on the subject opportunity.

34.     APR Energy's customer lists constitute proprietary and highly confidential information that would be extremely damaging to APR Energy should it fall into a competitor's hands. APR Energy invested extensively in developing its customer lists, which include current or past customers of the company, as well as potential customers based on forecasted or predicted potential need. Acquiring APR Energy's customer lists would give a competitor the opportunity

to approach parties in which APR Energy developed relationship or has expended assets to identify or target, and in doing so, wrongfully attempt to steal or solicit the business of such customers from APR Energy.

35.     APR Energy's asset configurations constitute proprietary and highly confidential information that would be extremely damaging to APR Energy should it fall into a competitor's hands, as it did when Church joined the American Power Entities, as described further below. That information indicates where APR Energy's assets are placed, the availability of current electrification assets and equipment, and the fungibility of available assets to potential projects. A competitor armed with this information would be able to bid and compete more effectively against APR Energy for future work, as it would be aware of the limitations that APR Energy faced in allocating assets and meeting demand.

## C.     *Ben Church Develops "Green, Clean, and Steam" and Advances Other Renewable Programs and Strategies at APR Energy.*

36.     Prior to being hired at APR Energy, Church had experience in the wind and solar energy industry.

37.     While at APR Energy, Church promoted the use of solar, wind, hydro and geothermal technologies within the primary mission and strategy of APR Energy.

38.     While serving as CEO of APR Energy, Church had responsibility over its initiatives, including APR Energy's plan to use renewable energy technologies to augment its mobile gas turbines.

39.     Church contributed to the development of the renewable energy strategy at APR Energy known as "Green, Clean, and Steam."

40.     Under Church's guidance as CEO of APR Energy, APR Energy spent its time, money, and resources investing in renewable technologies and opportunities.

41.     In one example, Church travelled as APR Energy's CEO to the country of Georgia to explore a project wherein APR Energy would deploy renewable energy services in Georgia.

42.     Under Church's leadership, one of APR Energy's stated goals was to expand into high value renewable projects.  This strategy included evaluating opportunistic acquisitions to acquire renewable energy generating sources.

43.     In another example, while Church was the CEO of APR Energy, he oversaw a deal wherein APR Energy would acquire technology for mobile solar applications.

**D.     *Ben Church Owed Fiduciary Duties to APR Energy and its Members and Entered Numerous Covenants Related to His Employment with APR Energy.***

44.     As Chief Executive Officer and a board member of APR Energy, Church owed fiduciary duties to APR Energy and its members under Florida law. These fiduciary duties included the duties of loyalty, care, and good faith.

45.     In connection with his hiring as Chief Executive Officer, Church entered into an Employment Contract on July 16, 2021 (the "Employment Agreement"). A copy of the Employment Agreement is incorporated herein as **Exhibit A**.  *See* [DE 01-3]. Falconbridge Services, LLC is an affiliate of APR Energy.  Its role, among APR Energy and its affiliates, is to coordinate the hiring, payroll, and benefits of employees for APR Energy and its affiliates. In other words, Falconbridge Services, LLC acts for the benefit of APR Energy. As Church was and is aware, Falconbridge Services, LLC hired Church to act as the Chief Executive Officer of APR Energy and all of its affiliates. The Employment Agreement was directly and primarily intended to benefit APR Energy. This is reflected by the following, among other facts:

- The Employment Agreement required Church to sign a Non-Competition, Non-Solicitation, and Non-Interference Agreement, which specifies that Church was hired as the Chief Executive Officer of APR Energy;
- The Employment Agreement's covenants repeatedly emphasize that they are for the protection of "the Company Group," which is entitled to preliminary and

permanent injunctive relief, damages, and an equitable accounting of all earnings, profits, and other benefits in the event of a breach. The "Company Group" is defined to include APR Energy, which is a subsidiary of Atlas Corp., affiliate of Falconbridge Services, LLC, and an entity as to which Church had responsibility, material dealings, and from which he obtained confidential information;

- The Employment Agreement required, as a condition of Church's employment, for Church to agree to the Policies listed in Section 14 of the Employment Agreement. The Policies, as alleged further below, were with APR Energy and for the benefit of APR Energy;

- Church was listed as the Chief Executive Officer of APR Energy and the other APR operating entities in corporate filings;

- Church was listed as the Chief Executive Officer of APR Energy—and repeatedly described himself as such—in public comments and documents;

- Church was a board member and officer of APR Energy and its affiliated entities.

46.     The Employment Agreement included covenants of confidentiality and non-disclosure. Church acknowledged that he would receive access to "confidential and proprietary information" of APR Energy, including, but not limited to, "information received from third parties under confidential conditions, business plans, customer lists, customer files, products and services offered or in development, strategic direction, marketing strategies and plans, software, designs, procedures, formulas, processes, financial data and results of operations; and . . . other know-how, ideas, concepts, trade secrets, and methodologies . . . ." Ex. A [DE 01-3] ¶ 10. Church agreed not to disclose, and to maintain the confidentiality of, this information. *Id.*

47.     The Employment Agreement also required Church to return, upon the termination of his employment "for any reason or at any time upon the Company's request . . . all documents, materials, and computer media in any form . . . belonging to the Company Group or otherwise containing Confidential Information and all other property of the Company Group in or under your possession or control." *Id.* ¶ 11.

48.     On August 30, 2021, Church signed an acknowledgment (the "Ethics Acknowledgment") of having received and read the Code of Business Conduct and Ethics Policy of Atlas Corp., which Atlas Corp. promulgates primarily and directly for the benefit of itself and

its subsidiaries, including APR Energy. The Ethics Acknowledgement is incorporated herein as **Exhibit B**. *See* [DE 03-4]. In the Ethics Acknowledgment, Church agreed that he understood "his obligations" under the Code of Business Conduct and Ethics Policy and promised to "undertake, as a condition to [his] present and continued employment at, appointment to the Board, or other affiliation with Atlas, to comply with the principles, policies and laws outlined in the Code of Business Conduct and Ethics Policy." Ex. B [DE 01-4].

49.     The Code of Business Conduct and Ethics Policy, which is incorporated as **Exhibit C**, prohibits Church from "discussing or disclosing any confidential information about Atlas unless properly authorized to do so. This would include sharing information with any external third-party, as well as limiting the sharing of information within Atlas on a 'need to know' basis only. This requirement remains in effect during and after employment with Atlas." *See* Ex. C [DE 01-05] at 11.

50.     The Code of Business Conduct and Ethics Policy also includes covenants on conflicts of interest. Pursuant to Church's assent to the Code of Business Conduct and Ethics Policy, Church was prohibited from

- "being employed by any business that competes, directly or indirectly, with Atlas;"
- "[h]aving a direct or indirect personal financial relationship with a competitor, customer, or supplier . . . ;" or
- [e]ngaging in any other employment or extensive personal projects during work hours, or using Atlas property in other employment[.]"

*Id.* at 15.

51.     On August 30, 2021, Church agreed to APR Energy's Conflict of Interest Policy, which is incorporated as **Exhibit D**. *See* [DE 01-6]. Church's Employment Agreement with APR Energy also incorporated the terms of certain policies, including, but not limited to, the Conflict of Interest Policy. Ex. A [DE 01-3] ¶ 14.

52.     The Conflict of Interest Policy states that a "conflict of interest exists when a personal interest interferes or appears to interfere with business practices of the ability to make objective business decisions." Ex. D [DE 01-6]. Among conflicts of interest listed are "[c]ompeting with APR Energy" and "[f]inancial interests in certain businesses." *Id.*  In agreeing to the Conflict of Interest Policy, Church agreed to "report any known or perceived conflicts of interest to [his] Manager or Human Resources, as well as the Legal and Compliance Department." *Id.*

53.     On August 30, 2021, Church agreed to APR Energy's Confidentiality and Assignment of Proprietary Rights Agreement, which is incorporated as **Exhibit E**. *See* [DE 01-7]. Church's Employment Agreement with APR Energy also incorporated the terms of certain policies, including, but not limited to, the Confidentiality and Assignment of Proprietary Rights Agreement. Ex. A [DE 01-3] ¶ 14.

54.     The Confidentiality and Assignment of Proprietary Rights Agreement provided that "[i]n consideration of the Company's employment or the continued employment of [Church], the Company and [Church] have agreed that [Church] will keep all Confidential Information confidential and that all Work Product (and all property rights related to Work Product) are owned and shall belong to the Company, on the terms and conditions set forth below." Ex. E [DE 01-7] at 1.

55.     The Confidentiality and Assignment of Proprietary Rights Agreement defined "Confidential Information" as:

> any nonpublic information that the Company designates as being confidential or which relates in any way to the Company's business including, but not limited to: (i) trade secrets, personnel lists, client lists and prospects, business opportunities, financial information, research, services used, pricing, product sourcing, marketing strategies and methods, business strategy, equipment design and technical specifications, and other proprietary information . . . (whether written, printed, on

computer diskette, hard drive or tape, machine or user readable or otherwise) relating in any way to the Company's existing and proposed business; (ii) the terms and conditions of any proposed or actual contract concerning the Company's products or services; and (iii) any other information pertaining thereto, whether in tangible media or in any other form.

*Id.*

56.     Under the Confidentiality and Assignment of Proprietary Rights Agreement, Church is obligated to "protect and preserve the confidentiality of the Confidential Information, and shall not disclose, permit disclosure of, transfer, or otherwise make available the Confidential Information to any person or entity without the prior written consent of the Company." *Id.*

57.     The Confidentiality and Assignment of Proprietary Rights Agreement also provides that Church "shall be responsible for any misuse of the Confidential Information or other breach of this Agreement by anyone who obtains access to the Confidential Information through the Employee without authorization of Company." *Id.*

58.     The Confidentiality and Assignment of Proprietary Rights Agreement defines "Work Product" as

all inventions, discoveries, improvements, trade secrets, formulas, techniques, data, programs, systems, specifications, documentation, source codes, processes, and other information, including works-in-progress or previously created by the Employee, whether or not subject to patent, trademark, copyright, or trade secret protection, and whether or not reduced to practice, which are made, created, authored, conceived, or reduced to practice by the Employee, either alone or jointly with others, during the period of the Employee's employment by the Company which: (i) relate in any way to the actual or anticipated business, activities, research, or investigations of the Company; (ii) result from or are suggested by work performed by the Employee for the Company (whether or not made or conceived during normal working hours or on the premises of the Company); or (iii) which result, to any extent, from use of Company's premises or property.

*Id.* at 2.

59.     Under the Confidentiality and Assignment of Proprietary Rights Agreement, Church "disclaims any and all interest in any work product," pledges to assist the Company in

enforcing its rights to its work product, and agrees, in the event of his termination from the company "for whatever reason" to promptly

> (i) deliver to the Company all physical property, discs, documents, notes, printouts, and all copies thereof and other materials in the Employee's possession or under the Employee's control pertaining to the Company's business, including, but not limited to, those embodying or relating to Confidential Information or Work Product; (ii) deliver to the Company all notebooks, workpapers, and other data relating to research or experiments or other work conducted by the Employee in the scope of the Employee's employment, and any Work Product made, created, authored, conceived, or reduced to practice by the Employee, either alone or jointly with others; and (iii) make full disclosure relating to any Work Product.

*Id.* at 3.

60.     Church expressly acknowledged in the Confidentiality and Assignment of Proprietary Rights Agreement that

> the Company would suffer irreparable harm in the event of any violation or breach by the Employee of any of the terms and conditions of this Agreement, that the Company's remedies at law for such a violation or breach would be inadequate, and that, as a consequence, the Company shall be entitled to seek specific performance or an injunction to remedy any breach of this Agreement by the Employee.

*Id.* at 4.

61.     The Confidentiality and Assignment of Proprietary Rights Agreement provides that its terms and Church's obligations under the agreement survive the termination of Church's employment by the company. *Id.* at 3–4.

62.     The Confidentiality and Assignment of Proprietary Rights Agreement includes a provision awarding attorney's fees and costs to the prevailing party if the agreement is breached. The provision states that "[i]f either party breaches its respective obligations under this Agreement, and the other party is thereby required to incur attorneys' fees or other fees or costs, the party so incurring such fees shall be entitled to the payment of those fees and costs by the breaching party." *Id.* at 4.

63.     On September 8, 2021, Church agreed to abide by the terms of APR Energy's Employee Handbook. The "Receipt and Acknowledgement" of which is incorporated herein as **Exhibit F**. *See* [DE 01-8].  In the Receipt and Acknowledgement of Employee Handbook, Church agreed to "comply with all policies in the Handbook and any amendments." Ex. F [DE 01-8]. Church's Employment Agreement with APR Energy also incorporated the terms of certain policies, including, but not limited to, the APR Handbook Acknowledgement. Ex. A [DE 01-3] ¶ 14.

64.     The Employee Handbook, incorporated as **Exhibit G**, contains provisions on employee obligations to maintain the confidentiality of APR Energy's materials. In relevant part, it provides that employees

> will keep confidential and not divulge, use, furnish, or make accessible to any other party any of the Company's Proprietary Information, including, but not limited to, confidential information and business secrets, customer lists, client names, photographs, costs, prices, profits, markets, products, key personnel, policies, operational methods, plans for future developments, and other business affairs and methods, and other information not readily available to the public, except as required by law.

Ex. G [DE 01-9] at 26. The Employee Handbook expressly notes that "[y]ou understand that this provision of the Handbook survives the end of the employment relationship between you and the Company and shall be enforceable at all times in the future." *Id.*

65.     The Employee Handbook also obligated Church to abide by APR Energy's policies on outside employment. In relevant part, the Employee Handbook provides that "[e]mployees may not take an outside job, either for pay or as a donation of her/his personal time, with a customer or competitor of the Company; nor may they do work on their own if it competes in any way with the sales of products or services we provide our customers." *Id.* at 33.

66.     The Employee Handbook also barred Church from creating either a conflict of interest or the appearance of a conflict of interest. Accepting outside employment or financial interests that would create such a conflict or its appearance was specifically prohibited. *Id.*

67.     Church also entered into a Non-Competition, Non-Solicitation and Non-Interference Agreement with APR Energy, incorporated as **Exhibit H** (the "Non-Compete Agreement"). Church and APR Energy entered into the agreement on July 14, 2021, and its effective date was August 9, 2021, Church's official start date. Ex. H [DE 01-10] at 1.

68.     The Non-Compete Agreement contains two covenants on competition with APR Energy. The first provision is entitled "During Employment" and provides that Church "shall not own, manage, operate, control, consult or work in any other capacity for any business in competition with APR's Business." *Id.*

69.     The second provision on competition with APR Energy is entitled "After Employment" and provides that "[u]pon termination of this Agreement under this subsection, Employee shall not own, manage, operate, consult or work in any other capacity for any business in competition with APR's Business (as defined above) anywhere within the United States and Canada for a period of twelve (12) months from the effective date of termination of Employee's employment with APR." *Id.*

70.     The Non-Compete Agreement defines APR's Business as "[a]ny activities involving the design, construction, operation and maintenance of power plants." *Id.*

71.     The Non-Compete Agreement also contains provisions on the solicitation of APR Energy's business, customers, or employees. The Non-Compete Agreement provides that Church

> agrees that while employed by APR and for a period of twelve (12) months
> following the termination of employment for any reason, [Church] will not, directly
> or indirectly, solicit or attempt to solicit any business in competition with the
> Business of APR from any customers of APR, with whom [Church] had material

contact at any time during [Church's] employment with APR, nor will [Church] directly or indirectly solicit any vendors of APR, with whom [Church] had any material contact during [Church's] employment with APR, to provide services to any business which competes with the Business of APR.

*Id.*

72.     The Non-Compete Agreement also provides that Church

further agrees that while employed by APR and for a period of twelve (12) months following the termination of employment for any reason, Employee will not, directly or indirectly, solicit or attempt to solicit any other employee of APR, or any of its subsidiary or affiliated companies (collectively, the "APR Companies"), for the purpose of encouraging, enticing or causing said employee to voluntarily terminate employment with any of the APR Companies.

*Id.* at 2.

**E.     *Church Conspires with a Direct Competitor of APR Energy All While Continuing to Serve as APR Energy's Chief Executive Officer, and in Doing So, Willfully Violates His Agreements with APR Energy and His Duties of Loyalty, Good Faith, and Care to APR Energy and its Members.***

73.     On or about November 6, 2023, Church accepted an offer of employment from the American Power Entities. This offer letter is incorporated as **Exhibit I**. *See* [DE 01-11].

74.     On or about November 9, 2023, Church agreed to, and executed, a formal contract of employment with the American Power Entities pursuant to which his official title would be Chief Operating Officer of APR Green Assets LLC (the "Conflicting Employment Contract"). The Conflicting Employment Contract is incorporated as **Exhibit J**. *See* [DE 01-12].

75.     Church's title as COO of APR Green Assets LLC is a mere formality. In reality, Church was hired by, is employed by, and continues to work on behalf of, all of the American Power Entities.

76.     Although the formal parties to the Conflicting Employment Contract were Defendant APR Green Assets LLC and Church, the terms of the agreement provide that Church's

employment and job responsibilities pertain to not only APR Green Assets LLC but all of the American Power Entities. Ex. J [DE 01-12].

77.     The Conflicting Employment Contract defines "Company's Affiliates" as "the Company, its parent (American Power Resources, LLC), and each of their parents, present and future subsidiaries, financiers, affiliates, related parties, members, managers, beneficial owners, officers, directors, shareholders, and employees." *Id.* ¶ 1.4.

78.     The Conflicting Employment Contract defines the term "business" as

all business activities, services, and products, *including but not limited to all business activities of the Company's Affiliates (as defined herein)*, services, and products, including but not limited to, real estate, development, construction, finance, ownership, operation and maintenance of renewable energy systems and assets, and the expertise for creation of new and integration of existing data centers with the transition of their energy needs to renewable energy, *as well as Company's entering into agreements with American Power Resources, LLC, its parent, subsidiaries and affiliates* and/or third party companies and strategic joint venture agreements with American Power and/or third party companies.

*Id.* ¶ 1.1 (emphasis added).

79.     The Conflicting Employment Contract defines the term "services" as:

Employee shall perform the Services for the Company and report to the Employee's direct supervisor, assigned supervisors, President, and/or CEO of the Company, the *duties of which are set forth in the attached Schedule 1.6*, and shall render services exclusively on behalf of the Company in connection with the Company's *Business and related businesses*, and shall include other business initiatives entered into by the Company from time to time and at any time in the future, in accordance with the professional standards, safety standards, and practices established by the Company.

*Id.* ¶ 1.6 (emphasis added).

80.     The Conflicting Employment Contract's repeated use of "Company Affiliates" and "business," which itself incorporates the "Company Affiliates," as noted above, "services" and "related businesses" together establish that Church's employment and job responsibilities are with, and in service to, the American Power Entities.

81.     For example, Section 1.5 of the Conflicting Employment Agreement states that "Employee shall use Employee's best efforts to perform his Services and Employee shall devote Employee's entire and exclusive working time, energy, skill and best efforts to the performance of his duties hereunder in a manner which will faithfully and diligently further the *business* and interests of the Company." *Id.* ¶ 1.5 (emphasis added). Because "business" is defined as including the business activities of the Company's Affiliates, and "services" is defined as work on behalf of not only the Company's business, but also related businesses, the Conflicting Employment Agreement obligates Church to provide employment services to the American Power Entities.

82.     In addition, the Conflicting Employment Agreement repeatedly includes "Company Affiliates" as entities that are protected in the event of Church's default under the agreement, *Id.* ¶ 3.1, entitled to attorney's fees and costs and injunctive relief in the event of Church's breach of the agreement, *Id.* ¶ 3.1, entitled to protection under the non-disclosure, intellectual property, work product, and confidentiality provisions of the agreement, *Id.* ¶¶ 5.2–5.3, and entitled to indemnification from Church, *Id.* ¶ 5.5.

83.     The Conflicting Employment Agreement was also signed and executed by the founder and CEO of the American Power Entities, AJ Javan (hereinafter, "Javan"). Javan's profile on Linkedin and one of the American Power Entities' websites, apr.energy, represent Javan as the founder and CEO of "American Power Resources" and all entities under the "American Power Resources" umbrella, including the American Power Entities. The American Power Entities' website, apr.energy, furthermore represents American Power Realty LLC, APR Renewables LLC, APR Green Assets LLC, and APR Green Data LLC as "business units" of American Power Resources LLC and Javan as their founder and CEO.

84.     The website of the American Power Entities also characterizes the American Power Entities as a single corporate enterprise. The "About Us" page of the American Power Entities' website, https://apr.energy/about-us/#who-we-are, describes the American Power Entities as having a single leadership team, and states that "American Power Resources' businesses use a multi-dimensional approach to provide comprehensive solutions for the customers, people, and communities we serve." It also characterizes "APR" as "Our Company":



85.     The American Power Entities are direct competitors of APR Energy. Like APR Energy, the American Power Entities provide electricity generation and utility services to clients and potential customers. The American Power Entities together represent themselves as "APR" and offer clients and potential customers the ability to purchase electricity generation services, including photovoltaic and battery assets. American Power Holdings, LLC and American Power Resources LLC do this, in part, by coordinating the offerings and services of what they describe as their "business units"—APR Renewables LLC, American Power Realty LLC, APR Green Assets LLC, and APR Green Data LLC. APR Renewables LLC develops and builds commercial

and utility-scale photovoltaic and battery assets for clients and potential customers. American Power Realty LLC is engaged in leasing and owning real property in which photovoltaic, battery, and other green assets are deployed or constructed. APR Green Assets LLC invests in, operates, manages, and owns renewable energy power plants. APR Green Data LLC offers to construct photovoltaic electricity-generation facilities at data centers. These entities—which their parent companies American Power Holdings, LLC and American Power Resources LLC themselves characterize as a single joint and integrated operation—offer services that directly compete with APR Energy's business and services.

86.     In addition, further evidence of the competition between APR Energy and the American Power Entities is that, since being hired at the American Power Entities, Church has used the proprietary potential client lists of APR Energy that he obtained as APR Energy's CEO to solicit potential customers for the American Power Entities. Church attempted to convince those potential customers, with whom he also had material contact at APR Energy, to not use APR Energy's services to meet their electrification needs and to use the American Power Entities to meet those needs instead.

87.     Church also publicly commented on APR Energy's suite of electrification options in the past. For example, during his tenure at APR Energy, Church offered a video message, which APR Energy at the time promoted publicly, regarding the broad array of electrification options that APR Energy offers. The video references solar and wind electrification. During the video, Church states that APR Energy "has all the right parts and pieces . . . to do literally anything."

88.     APR Energy terminated Church's employment on January 23, 2024, one day after APR Energy learned that Church was working as the COO of the competing American Power Entities.

89.     Church's employment as APR Energy's CEO overlapped with his employment at the American Power Entities from no later than early November 2023, when the American Power Entities formally hired Church, to January 23, 2024, the date that APR Energy fired him.

**F.     Ben Church and the American Power Entities Blatantly Misuse APR Energy's Confidential and Proprietary Information.**

90.     In October of 2023, a major contractor (the "Prospective Customer") approached APR Energy Vice President of Engineering, Damon Tohill, regarding the contractor's need for an electrification supplier to provide an electrification solution for a data center that the contractor would be building in Arizona. The data center would eventually be operated and managed by an S&P 500 real estate investment trust on behalf of one of the world's largest and most well-known technology and e-commerce platforms.

91.     In November of 2023, while working as the CEO for APR Energy and simultaneously for the American Power Entities, Benjamin Church met with the Prospective Customer for an initial introductory meeting.

92.     Thereafter, Church and Mr. Tohill met with the Prospective Customer to discuss the opportunity in more detail.

93.     On December 11, 2023, Mr. Tohill prepared a draft term sheet regarding this opportunity with the Prospective Customer.

94.     Church was deeply critical of the opportunity in discussions and communications with APR Energy leadership. Church repeatedly criticized the Prospective Customer and the credibility and seriousness of the customer's request.  Church also stated to APR Energy leadership that he did not think this opportunity would be a good fit for APR Energy as it would require a significant investment by APR Energy in a development project.

95.     On January 23, 2024, APR Energy fired Mr. Church.

96.     On February 1, 2024, Prospective Customer advised APR Energy that Church, while still employed at APR Energy, had pressured the Prospective Customer to enter into a term sheet with APR Renewables—rather than APR Energy. The Prospective Customer advised Church that Prospective Customer wanted to work with APR Energy, but that Church attempted to block the Prospective Customer from doing so.

97.     When the Prospective Customer pointed out to Church that APR Renewables did not provide the thermal/turbine generation equipment that the Prospective Customer desired, Mr. Church said that he could provide any solution for the Prospective Customer.

98.     Prior to joining APR Energy, Church had no experience in providing turbine power generation.

99.     Church and the American Power Entities utilized APR Energy's confidential and proprietary information, including APR Energy's confidential and proprietary plant design, equipment performance, other technical know-how, and cost and pricing models that Mr. Church was privy to during his tenure at APR Energy to directly compete with APR Energy in an attempt to steal away a prospective client and business opportunity.

100.    While the CEO of APR Energy, Church repeatedly transmitted APR Energy's confidential information via text message, WhatsApp messages, and via e-mail.  Examples of these transmissions, include texts and e-mails to other APR Energy employees containing information regarding APR Energy's pricing, customer lists, and business strategies.

101.    Upon information and belief, Church retained—and currently has access to—APR Energy's confidential and proprietary information stored in his personal text messages, WhatsApp messages, and e-mails—including his personal gmail account.

102.    APR Energy attempted to discern the extent of the confidential and property information Church has retained, but he has thus far refused to conduct a good faith search of his devices and storage platforms.

**G.**    ***The American Power Entities Blatantly Violate and Infringe on Plaintiffs' Trademark Rights and Intellectual Property.***

103.    The American Power Entities are blatantly violating Plaintiffs' trademark rights under Federal and Florida law.

104.    Collectively, Plaintiffs have been using the mark "APR Energy" (the "Mark") since July 1, 2008. Enterprises in the United States and across the globe identify the Mark with APR Energy, and the Mark constitutes an integral part of Plaintiffs' brand, name identification, and recognizability.   For example, APR Energy affixed "APR" and "APR Energy" to almost everything it produces, including, but not limited to, its electrification and battery equipment and solutions, product wrapping, signage, marketing, communications, and digital materials, including its webpage, aprenergy.com. 'APR' is, and has always been, the dominant portion of the Mark and is recognized as such by customers and the public.

105.    APR Energy began marketing and selling its goods and services throughout the United States and the world using the Mark at least as early as July 1, 2008.  New APR uses and will continue to use the Mark to market and sell its goods and services in the market for electricity generation and utility services.

106.    On February 19, 2004, APR Energy registered its website aprenergy.com, through which APR Energy's goods and services have been continuously promoted, offered, and sold in both interstate and international commerce to United States and global consumers under the Mark. New APR has acquired the aprenergy.com domain name as part of the asset purchase agreement, and it maintains that domain name.

107.    As an integral part of APR Energy's branding and marketing, APR Energy created and has continuously promoted APR Energy's goods and services in connection with the Mark through its social media accounts, such as its accounts on X, Facebook, and Linkedin.  New APR will continue such branding and marketing efforts using the Mark.

108.    APR Energy expended substantial time, money, and effort to advertise and promote APR Energy's goods and services under the Mark.  New APR will continue to expend substantial time, money, and effort to advertise and promote APR Energy's goods and services under the Mark.

109.    Plaintiffs' extensive and continuous use of the Mark in connection with their goods and services has indelibly impressed on the minds of the relevant consuming public that the Mark identifies Plaintiffs as the source of their goods and services.

110.    As evidence of this, New APR paid a significant sum to acquire the valuable Mark in an asset purchase agreement that closed on December 31, 2024.

111.    Accordingly, Plaintiffs own valuable trademark rights in the Mark, which are protected under federal and Florida law.

112.    Plaintiffs also own four U.S. registrations for the mark APR Energy. These registrations consist of Registration Nos. 3654109, 4145502, 4330688, and 4534470. These registrations are incorporated as **Exhibit K**.  *See* [DE 01-13].

113.    Registration Nos. 4145502 and 4330688 are for the standard characters within the phrase APR Energy "without claim to any particular font style, size, or color." Ex. K [DE 01-13]. As the beginning element of the Mark and followed by the common word "energy," "APR" is the dominant and more distinctive portion of the Mark.

114.    Two of Plaintiffs' well-recognized and prominent logos reflect the Mark:

  

115.    The American Power Entities blatantly infringe on the Mark and intellectual property without the Plaintiffs' authorization. Since at least early 2022, the American Power Entities have infringed on the Mark in the marketing, promotion, and sale of their own goods and services.

116.    The logo used by the parent entities, American Power Holdings, LLC and American Power Resources LLC, infringes upon the Mark. It prominently uses "APR" and brazenly copies the typeface and stylization of Plaintiffs' logos:



117.    The logo for APR Renewables LLC infringes upon the Mark. It uses "APR" and brazenly copies the typeface and stylization of Plaintiffs' logo:



118.    The logo for APR Green Assets infringes upon the Mark. It uses "APR" and brazenly copies the typeface and stylization of Plaintiffs' logo:



119.    The logo for APR Green Data infringes upon the Mark. It uses "APR" and brazenly copies the typeface and stylization of Plaintiffs' logo:



120.    Comparing the Plaintiffs' and the American Power Entities' logos side-by-side, the infringing nature of the American Power Entities' logos is patently clear.  The American Power Entities' infringing marks are likely to cause confusion or mistake as to affiliation, connection, or association as to the goods or services of the American Power Entities with those of Plaintiffs:









121.    The American Power Entities also repeatedly use the Mark in an infringing matter, and without Plaintiffs' authorization, on their websites. For example, the apr.energy website describes the American Power Entities as "APR," declares "WE ARE APR," and thereafter lists American Power Realty LLC, APR Renewables LLC, APR Green Assets LLC, and APR Green Data LLC as "APR's Businesses":



122.    The American Power Entities' websites, apr.energy and aprenew.com, also infringe on the Mark. Incredibly, the domain name for the American Power Entities' main website is apr.energy. The domain name for Plaintiffs' business is aprenergy.com. Apr.energy is a counterfeit of the Mark and is designed to confuse the public and potential and existing customers of the relationship between the American Power Entities and Plaintiffs.

123.    As noted above, APR Energy registered the domain name, aprenergy.com, on February 19, 2004.

124.    The American Power Entities registered apr.energy and aprenew.com on October 29, 2021.

125.     The American Power Entities registered apr.energy and aprenew.com using an agent, Domains by Proxy, LLC, which is a company based in Arizona that registers a domain on behalf of its true owner in order to assist the true owner in hiding its identity.

126.     At the time of his hire as an executive at the American Power Entities, Church had full knowledge of the Mark, use of the Mark, use of aprenergy.com, intellectual property rights, and long history of using the Mark. Despite this knowledge, Church, after he joined the American Power Entities, actively and knowingly caused the American Power Entities to continue infringing upon and counterfeiting the Mark and ratified their continued infringement upon and counterfeiting of the Mark.

127.     The American Power Entities' infringements and counterfeit of the Mark and intellectual property rights were intentional, willful, deliberate, and done in bad faith.

128.     The American Power Entities uses of the Mark are substantially identical in sight, sound, meaning, and commercial impression to the Mark. The American Power Entities were aware of APR Energy's existence and the Mark before they began infringing upon and counterfeiting the Mark, as alleged above.

129.     Plaintiffs' and the American Power Entities' respective goods and services, both of which are being offered under the Mark due to the American Power Entities' infringement, are marketed and sold in overlapping geographic regions to the same class of purchasers and through the same trade channels. Plaintiffs and the American Power Entities compete in the market for electricity generation and utility services. Customers in the market for electricity generation and utility services have multiple options for securing a supply of electricity. Plaintiffs offer customers mobile gas turbine fleets and photovoltaic and wind power solutions. Plaintiffs also are planning to offer hydrogen power solutions. The American Power Entities offer customers photovoltaic

power solutions, which compete directly, as discussed above, with Plaintiffs' own suite of electrification options. Plaintiffs and the American Power Entities also serve customers in overlapping geographic regions. Plaintiffs serve customers both in the United States and internationally. The American Power Entities serve customers domestically.

130.     The American Power Entities and Church are fully aware that they compete with Plaintiffs. Church helped to develop APR Energy's strategic objective of developing its suite of electrification options to include photovoltaic, wind, and hydrogen options. Church and the American Power Entities have also approached potential customers of APR Energy—who they became aware of due to Church's interactions at APR Energy and wrongful divulgence of APR Energy's proprietary and highly-confidential customer information—and attempted to convince them to use the American Power Entities instead of APR Energy to meet their electrification needs.

131.     As a result of the American Power Entities' marketing and sale of their goods and services in connection with the Mark, consumers are likely to be confused such that consumers will erroneously believe that the American Power Entities are affiliated, connected, or associated with, or in some way related to, Plaintiffs' goods or services offered under the Mark.

132.     In fact, APR Energy and its employees have been repeatedly approached by members of the public who are confused between APR Energy and the American Power Entities and who wrongfully believe, because of the American Power Entities' wrongful conduct and deceit, that APR Energy and the American Power Entities are one and the same.

## COUNT I

### CYBERSQUATTING UNDER THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT, 15 U.S.C. § 1125(d)

**Plaintiffs Against the American Power Entities**

133.     Plaintiffs reallege and incorporate by reference the allegations set forth above in

paragraphs 1 through 132.

134.    Plaintiffs have registered "APR Energy" with the U.S. Patent and Trademark Office, and "APR Energy" constitutes Plaintiffs' registered mark. *See* Ex. K (registrations with the U.S. Patent and Trademark Office).

135.    Plaintiffs' four U.S. registrations of the Mark constitute, as a matter of federal law, "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein . . . ." 15 U.S.C. § 1115(a); *see also* Ex. K.

136.    The goods and services specified in each of the U.S. registrations include the goods and services over which the American Power Entities and Plaintiffs compete and which the American Power Entities market, promote, and sell using the domain names apr.energy and aprenew.com. Goods and services specified in the registrations include but are not limited to: "Installation and maintenance of rapidly deployable turnkey power generation equipment" (Reg. Nos. 4145502 and 3654109); "Installation and maintenance of power generation equipment" and "Utility services, namely, transmission of electricity and electric power; fast-track capacity power and electricity services, namely, providing standby electricity and electric power" (Reg. Nos. 4330688 and 4534470). *See id.*

137.    Plaintiffs also possesses common law trademark rights in the Mark given that it has used it since July 1, 2008.

138.    The American Power Entities registered apr.energy and aprenew.com on October 29, 2021, over 13 years after APR Energy first began using the Mark. The American Power Entities

registered apr.energy and aprenew.com as the American Power Entities' websites and trafficked in and used, and continue to traffic in and use, the apr.energy and aprenew.com domain names.

139.    The Mark was distinctive at the time of the American Power Entities' registration of apr.energy and aprenew.com. It is distinctive because it has become associated, over more than a decade and a half, with Plaintiffs' products and services. The name APR Energy has a primary significance in the public mind with Plaintiffs, and Plaintiffs have used the APR Energy name continuously and substantially exclusively for longer than five years. Moreover, APR is, and has always been, the dominant portion of the Mark and is recognized as such by customers and the public.

140.    Apr.energy is identical or confusingly similar to the mark "APR Energy." It consists of the exact same letters and name, separated only by a period. It also begins with "Apr," which is, and has always been, the dominant portion of the Mark and is recognized as such by customers and the public.

141.    The American Power Entities registered apr.energy and aprenew.com using an agent and proxy, Domains by Proxy, LLC, which is a company based in Arizona that registers a domain on behalf of its true owner.  The American Power Entities are the true or *de facto* registrants of apr.energy and aprenew.com, or, in the language of 15 U.S.C. § 1115(a), the authorized licensees of Domains by Proxy, LLC, the official, *de jure* registrants of the domain.

142.    Aprenew.com is confusingly similar to the Mark, as would be any domain name starting with "apr." "Apr" is, and has always been, the dominant portion of the Mark and is recognized as such by customers and the public.

143.    The American Power Entities registered apr.energy and aprenew.com with a bad faith intent to profit from the Mark and have continued to have a bad faith intent to profit from the

Mark in continuing to own, use, manage, operate, and promote apr.energy and aprenew.com. The American Power Entities registered and continue to use the domains apr.energy and aprenew.com for two purposes. First, the American Power Entities registered and continue to use the domains apr.energy and aprenew.com as leverage to get Plaintiffs to pay money to the American Power Entities, or otherwise provide the American Power Entities with things of value, in order for Plaintiffs to secure ownership over apr.energy and aprenew.com from the American Power Entities and protect its intellectual property rights from the American Power Entities. Second, the American Power Entities registered apr.energy and aprenew.com to bolster their own business and competitive position by confusing consumers in the electricity generation market about the association between the American Power Entities and Plaintiffs. Put differently, the American Power Entities have used, and are continuing to use, the apr.energy and aprenew.com domains to divert customers from the website of Plaintiffs, aprenergy.com, to the websites of the American Power Entities, apr.energy and aprenew.com, to order to divert business from Plaintiffs.

144.     Pursuant to 15 U.S.C. § 1125(d)(1)(B), the American Power Entities' bad faith is also established for reasons that include, but are not limited to, the following: (1) Plaintiffs own trademark or other intellectual property rights in the domain names apr.energy and aprenew.com; (2) the domain name "apr.energy" constitutes the legal name of Plaintiffs and is otherwise commonly used to identify Plaintiffs; (3) APR Energy used "APR Energy" in connection with the bona fide offering of its goods and services for approximately 13 years before the date that the American Power Entities registered the apr.energy and aprenew.com domains; (4) the American Power Entities have no bona fide noncommercial or fair use of the Mark in any site accessible under the apr.energy and aprenew.com domain names; (5) the American Power Entities have intended "to divert consumers from the mark owner's online location to a site accessible under the

domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site," § 1125(d)(1)(B)(i)(V); and (6) the American Power Entities provided material and misleading false contact information when applying for the registrations of apr.energy and aprenew.com by using a proxy, Domains by Proxy, LLC, to register the domains, all in an attempt to hide their identity as the true owners of the infringing domains and prevent APR Energy and others from identifying them as the cybersquatters.

145.    The American Power Entities also registered apr.energy and aprenew.com in reckless disregard of APR Energy's trademark and intellectual property.  The American Power Entities were aware, or should have been aware, of Plaintiff APR Energy's long use of APR Energy, APR Energy's trademark rights in APR Energy, the similarities between APR Energy, apr.energy, aprenew.com, and APR Energy's own website, aprenergy.com, and that the registration and use of apr.energy and aprenew.com would dilute APR Energy's goodwill and divert customers from APR Energy or the aprenergy.com website.

146.    The American Power Entities have, and are continuing to, profit off of the goodwill of Plaintiffs, the owner of the APR Energy trademark, and in doing so, have diluted the goodwill of Plaintiffs.

147.    The American Power Entities' acts of cybersquatting have therefore been committed with the intent to cause confusion, mistake, and to deceive, and were otherwise deliberate and/or in bad faith. Such intentional and willful conduct makes this an exceptional case.

148.    Plaintiffs have suffered and will continue to suffer from the American Power Entities' ownership and use of apr.energy and aprenew.com. Plaintiffs have lost, and will continue

to lose, goodwill from the American Power Entities' ownership and use of apr.energy and aprenew.com and customers and the public are being diverted from APR Energy and aprenergy.com to American Power Entities, and apr.energy and aprenew.com.

149.     Plaintiffs have no adequate remedy at law. Plaintiffs have suffered irreparable harm and will continue to suffer irreparable injuries unless the American Power Entities are enjoined from continuing to exploit, use, and cybersquat upon apr.energy, aprenew.com, or any other domain name controlled by any Defendant that begins with the three-letter combination "apr."

150.     Plaintiffs are entitled to injunctive relief in accordance with 15 U.S.C. § 1116(a).

151.     Plaintiffs are entitled to recover profits and damages as set forth in 15 U.S.C. § 1117(a).

152.     Plaintiffs are entitled to recover its attorneys' fees pursuant to 15 U.S.C. § 1117(a).

153.     As set forth in 15 U.S.C. §1125(c), the Court may order apr.energy, aprenew.com, or any other domain name controlled by any Defendant that begins with the three-letter combination "apr" to be transferred to Plaintiffs. In the alternative, the Court may order the forfeiture or cancellation of apr.energy, aprenew.com, or any other domain name controlled by any Defendant that begins with the three-letter combination "apr."

WHEREFORE, Plaintiffs request judgment in their favor and against the American Power Entities for damages, temporary and permanent injunctive relief, pre-judgment and post-judgment interest, attorney's fees and costs, the transfer of apr.energy, aprenew.com, and any other domain name controlled by any American Power Entity that begins with the three-letter combination "apr" to the ownership and possession of Plaintiffs or the forfeiture or cancellation of apr.energy, aprenew.com, and any other domain name controlled by any American Power Entity that begins with the three-letter combination "apr," and any further relief that this Court deems just and proper.

## COUNT II:

## TRADEMARK INFRINGMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125(a)

### Plaintiffs Against the American Power Entities

154.     Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 132.

155.     APR Energy used the Mark, including the name "APR," in Florida and throughout the United States on or in connection with the advertising, promotion, and sale of APR Energy's goods and services at least as early as July 1, 2008.

156.     New APR acquired ownership rights in the Mark on December 31, 2024, including all the goodwill associated with the Mark, in an asset purchase agreement.  New APR uses and will continue to use the Mark, including the name "APR," in Florida and throughout the United States on or in connection with the advertising, promotion, and sale of its goods and services.  New APR uses and will continue to use the Mark in connection with its offerings in the market for electricity generation and utility services.

157.     APR Energy continues to utilize the Mark pursuant to a limited license agreement with New APR.

158.     Collectively, Plaintiffs have used the Mark, including the name "APR," continuously in the United States for a period of time prior to the present to market and sell APR Energy's goods and services.

159.     The American Power Entities are using and infringing upon the Mark, including "APR," in commerce in connection with the advertising, promotion, and sale of their goods and services.

160.    The American Power Entities adopted and began using the Mark, including "APR," after APR Energy's first use of the Mark in the United States.

161.    Plaintiffs' rights in the Mark are therefore senior to the American Power Entities' rights—if any—in the Mark, when used in connection with power generation, utility products and services, or any other related goods and services.

162.    In addition, Plaintiffs' four U.S. registrations of the Mark constitute, as a matter of federal law, "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein . . . ." 15 U.S.C. § 1115(a); *see also* Ex. K (registrations with the U.S. Patent and Trademark Office).

163.    The goods and services specified in each of the U.S. registrations include the goods and services over which the American Power Entities and Plaintiffs compete. Goods and services specified in the registrations include but are not limited to: "Installation and maintenance of power generation equipment" and "Utility services, namely, transmission of electricity and electric power; fast-track capacity power and electricity services, namely, providing standby electricity and electric power." *Id*.

164.    The American Power Entities' use of the Mark for goods and services that are identical, nearly identical, directly competing, overlapping, and/or closely related to Plaintiffs' goods and services is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the American Power Entities with Plaintiffs, or as to the origin, sponsorship, or approval of the American Power Entities' goods, services, or commercial activities.

165.    In undertaking the conduct complained of in this action, the American Power Entities willfully, knowingly, and intentionally violated Plaintiffs' rights in the Mark, despite being on notice of Plaintiffs' prior rights.

166.    The American Power Entities' acts of infringement are therefore likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association, or as to the origin, sponsorship, or approval of the goods or services of the American Power Entities with those of Plaintiffs. In addition, the American Power Entities' acts of infringement have been committed with the intent to cause such confusion, mistake, and to deceive, and were otherwise deliberate and/or in bad faith. Such intentional and willful conduct makes this an exceptional case.

167.    Plaintiffs are entitled to injunctive relief in accordance with 15 U.S.C. § 1116(a).

168.    Plaintiffs are entitled to recover profits and damages as set forth in 15 U.S.C. § 1117(a).

169.    Plaintiffs are entitled to recover its attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiffs request judgment in their favor and against the American Power Entities for damages, temporary and permanent injunctive relief, pre-judgment and post-judgment interest, attorney's fees and costs, and any further relief that this Court deems just and proper.

## COUNT III:

## TRADEMARK INFRINGMENT AND UNFAIR COMPETITION UNDER 15 U.S.C. § 1114(a)

### Plaintiffs Against the American Power Entities

170.    Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 132.

171. Plaintiffs have registered "APR Energy" with the U.S. Patent and Trademark Office, and "APR Energy" constitutes Plaintiffs' registered mark. *See* Ex. K (registrations with the U.S. Patent and Trademark Office).

172. Plaintiffs' four U.S. registrations of the Mark constitute, as a matter of federal law, "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein . . . ." 15 U.S.C. § 1115(a); *see also* Ex. K.

173. The goods and services specified in each of the U.S. registrations include the goods and services over which the American Power Entities and Plaintiffs compete. Goods and services specified in the registrations include but are not limited to: "Installation and maintenance of power generation equipment" and "Utility services, namely, transmission of electricity and electric power; fast-track capacity power and electricity services, namely, providing standby electricity and electric power." *Id.*

174. The American Power Entities have used in commerce, without Plaintiffs' consent, a reproduction, counterfeit, copy, or colorable imitation of Plaintiffs' registered Mark in connection with the sale, distribution, or advertising of the American Power Entities' goods and services. This use by the American Power Entities is likely to cause confusion, or to cause mistake, or to deceive.

175. The American Power Entities have also, without Plaintiffs' consent, reproduced, counterfeited, copied, or colorably imitated the Mark in labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of the American Power Entities' goods or

services. The American Power Entities' uses are likely to cause confusion, or to cause mistake, or to deceive.

176.   The American Power Entities have also used a counterfeit mark under 15 U.S.C. § 1116(d)(1)(B). The American Power Entities' domain name of apr.energy constitutes a counterfeit of the Mark, which is registered on the principal register in the U.S. Patent and Trademark Office for installation and maintenance of power generation equipment and utility services sold, offered for sale, or distributed and which are in use. Apr.energy is identical, or substantially indistinguishable from, the mark "APR Energy." The American Power Entities have used and continue to use apr.energy to sell, offer for sale, promote, and market the installation and maintenance of power generation equipment and utility services. They intentionally used and continue to use the counterfeit mark knowing that it is counterfeit, and their use of the counterfeit mark was and is willful.

177.   The American Power Entities' acts of infringement, counterfeit, and uses of the Mark are likely to cause confusion, or to cause mistake, or to deceive and have been committed with knowledge that their acts, counterfeits, and uses were intended to cause confusion, mistake, and to deceive, and were otherwise deliberate, willful, intentional, and/or in bad faith. Such intentional and willful conduct makes this an exceptional case.

178.   Plaintiffs are entitled to injunctive relief in accordance with 15 U.S.C. § 1116(a).

179.   Plaintiffs are entitled to recover profits and damages as set forth in 15 U.S.C. § 1117(a).

180.   Plaintiffs are entitled to recover its attorneys' fees pursuant to 15 U.S.C. § 1117(a).

181.    As set forth in 15 U.S.C. § 1117(b)(1), Plaintiffs are entitled to recover three times the profits and damages set forth in 15 U.S.C. § 1117(a) for the American Power Entities' use of a counterfeit mark.

182.    In addition, pursuant to 15 U.S.C. § 1117(c), Plaintiffs may elect, at any time before final judgment is rendered by the trial court, to recover statutory damages established in 15 U.S.C. § 1117(c) in lieu of damages set forth in 15 U.S.C. § 1117(a), for the American Power Entities' use of a counterfeit mark.

WHEREFORE, Plaintiffs request judgment in their favor and against the American Power Entities' for profits and damages, including treble or statutory damages for acts of counterfeit, temporary and permanent injunctive relief, pre-judgment and post-judgment interest, attorney's fees and costs, and any further relief that this Court deems just and proper.

## COUNT IV:

## TRADEMARK INFRINGMENT AND UNFAIR COMPETITION UNDER FLORIDA COMMON LAW

**Plaintiffs Against the American Power Entities**

183.    Plaintiffs reallege and incorporate by reference the allegations set forth above in paragraphs 1 through 132.

184.    Plaintiffs owned common law trademark rights in the Mark and have priority rights in and to the Mark that date back to at least as early as July 1, 2008.

185.    Plaintiffs have used the Mark continuously and consistently for an extended period of time to identify, advertise, promote, and sell APR Energy's goods and services, which has indelibly impressed on the minds of the consuming public the impression that the Mark identifies Plaintiffs as the source of its power generation goods and services.

186.    The American Power Entities adopted and began using the Mark, as described above, after APR Energy first began using the Mark.

187.    The American Power Entities' acts have created and, unless restrained by this Court, will continue to create a likelihood of confusion and deception of the consuming public, causing irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.

188.    The American Power Entities' conduct constitutes unfair competition under the common law of Florida by a deliberate course of conduct, all without authorization, license, privilege, or justification.

189.    The American Power Entities have acted with full knowledge of Plaintiffs' rights in and use of the Mark, and without regard to the likelihood of confusion and deception of the public created by their activities.

190.    The American Power Entities' conduct demonstrates an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiffs and to deceive customers and the public, to the substantial and irreparable injury of Plaintiffs.

191.    As a result of the American Power Entities' acts, Plaintiffs have been damaged and will continue to be damaged in an amount not as yet determined or ascertainable. At a minimum, however, Plaintiffs are entitled to injunctive relief, an accounting of the American Power Entities' profits, actual damages, punitive damages, attorney's fees and costs, and any and all other relief authorized by law.

WHEREFORE, Plaintiffs request judgment in their favor and against the American Power Entities for actual and punitive damages, an accounting of the American Power Entities' profits, temporary and permanent injunctive relief, pre-judgment and post-judgment interest, attorney's fees and costs, and any further relief that this Court deems just and proper.

## COUNT V

## BREACH OF FIDUCIARY DUTIES

### APR Energy Against Defendant Church

192.    APR Energy realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 132.

193.    As the Chief Executive Officer and board member of APR Energy, Church had fiduciary duties to APR Energy and its members, including the duties of loyalty, care, and good faith.

194.    Church affirmed his fiduciary duties by executing numerous employee agreements, codes of ethics, and employee handbooks.

195.    For example, APR Energy and Church executed an Employment Agreement on July 16, 2021. *See* Ex. A.

196.    The Employment Agreement included covenants of confidentiality and non-disclosure. Church acknowledged that he would receive access to "confidential and proprietary information" of APR Energy, including, but not limited to, "information received from third parties under confidential conditions, business plans, customer lists, customer files, products and services offered or in development, strategic direction, marketing strategies and plans, software, designs, procedures, formulas, processes, financial data and results of operations; and . . . other know-how, ideas, concepts, trade secrets, and methodologies . . . ." *Id.* ¶ 10. Church agreed not to disclose, and to maintain the confidentiality of, this information. *Id.*

197.    Upon information and belief, Church took APR Energy's confidential and proprietary information with him to the American Power Entities, competitors of APR Energy, including but not limited to APR Energy's confidential and proprietary information that Church

sent to his personal e-mail account, information exchanged among in his personal text messages, information contained in his WhatsApp.

198.    In the Employment Agreement, Church agreed that:

[T]he restrictions contained in Sections 8 through 11 hereof, in view of the competitive nature of the business in which the Company Group is engaged, are reasonable and necessary in order to protect the legitimate interests of the Company Group, and *that any violation would result in irreparable injury to the Company Group*. You therefore acknowledge and agree that, in the event of a breach or threatened breach by you of any of Sections 8 through 11 hereof, the Company and other members of the Company Group *shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief (without proving actual damages or posting a bond or other security), as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such violation*, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled.

*Id.* ¶ 13.

199.    In the Confidentiality and Assignment of Proprietary Rights Agreement, Ex. E, Church agreed to the covenants contained within the Confidentiality and Assignment of Proprietary Rights Agreement. Ex. D.  The Confidentiality and Assignment of Proprietary Rights Agreement affirmed Church's fiduciary duty to APR Energy to keep all Confidential Information, as defined in the agreement, confidential.

200.    Church breached his fiduciary duties to APR Energy by failing to maintain the secrecy of APR Energy's confidential and proprietary information by, upon information and belief, e-mailing and texting information to himself and others, and by failing to return APR Energy's confidential and proprietary information to APR Energy upon his termination from APR Energy.

201.    APR Energy and Church entered into a Non-Competition, Non-Solicitation, and Non-Interference Agreement on July 14, 2021. *See* Ex. H.   The Non-Competition, Non-

Solicitation, and Non-Interference Agreement affirmed Church's fiduciary obligations to APR Energy not to compete with APR Energy while acting as its CEO.

202.    In violation of his fiduciary obligations to APR Energy, Church did, in fact, "own, manage, operate, control, consult or work in any other capacity for any business in competition with APR's Business" during the term of his employment with APR Energy. *Id.*

203.    Church violated the fiduciary duties he owed to APR Energy by working for the American Power Entities and by advancing their interests, to APR Energy's detriment, while employed as the Chief Executive Officer and board member of APR Energy.

204.    Church violated these duties by failing to treat APR Energy's confidential and proprietary information, as confidential, by accessing the information while he worked as an employee for the competing American Power Entities, and by retaining the information following his departure from APR Energy.

205.    Church also violated fiduciary duties owed to APR Energy by lying to APR Energy about the basis for charges that Church made to a corporate credit card. Church had a corporate credit card and was only authorized to charge legitimate corporate expenses to the card. Despite this, Church falsely claimed that numerous charges were for APR Energy's official business despite knowing that they were not.  APR Energy paid for these charges because of Church's false representation that they were for legitimate corporate purposes.  Incorporated as **Exhibit L**, *see* [DE 01-14], is a chart that provides: (1) each illegitimate expense that Church charged to the corporate credit card; (2) the nature or type of expense; (3) the merchant or seller associated with the expense; (4) the date on which Church charged the expense to the corporate credit card; and (5) the amount of each charge.

206.     APR Energy has been damaged by Church's illegitimate charges because APR Energy expended money to cover the charges in reliance on Church's false characterizations.

207.     APR Energy has been damaged by Church's breach of his fiduciary duties in the amount of his salary and benefits APR Energy paid to him as the Chief Executive Officer and board member of APR Energy, while he was simultaneously working for the American Power Entities and advancing their interests, to APR Energy's detriment.

208.     As to Church's retention of APR Energy's confidential and proprietary information, APR Energy lacks an adequate remedy at law. APR Energy has and will continue to suffer irreparable injuries unless an injunction is issued requiring Church to search for all of APR Energy's confidential and proprietary information in his possession, and destroy or return the same.

WHEREFORE, APR Energy requests judgment in its favor and against the Church for damages, temporary and permanent injunctive relief, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## COUNT VI

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

### APR Energy Against the American Power Entities

209.     APR Energy realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 132, and 193 through 208.

210.     As the Chief Executive Officer and board member of APR Energy, Church had fiduciary duties to APR Energy and its members, including the duties of loyalty, care, and good faith.

211.    The American Power Entities were fully aware that Church was APR Energy's Chief Executive Officer and board member when they hired him to work for them. The American Power Entities were fully aware that Church did not depart APR Energy upon the American Power Entities hiring of Church and knew that Church was working for both companies concurrently between the date that the American Power Entities hired Church and the date that APR Energy fired him.

212.    Church violated his fiduciary duties to APR Energy and its members by working for the American Power Entities and by advancing their interests, to APR Energy's detriment, while employed as the Chief Executive Officer and board member of APR Energy.

213.    Church also violated these duties to APR Energy and its members by failing to treat APR Energy's confidential and proprietary information as confidential, and utilizing that information while employed by the American Power Entities.

214.    The American Power Entities aided and abetted these breaches of Church's fiduciary duties and did so by providing Church with substantial assistance and encouragement of Church's violations of his breaches.  The American Power Entities provided substantial assistance by knowingly providing financial assistance and by encouraging Church to work for both companies concurrently.

215.    The American Power Entities knew that Church would continue to draw a salary and benefits from APR Energy, while working to its detriment and for the benefit of the American Power Entities.  The American Power Entities encouraged and assisted Church by hiring him at the American Power Entities without first requiring him to resign as CEO and a member of the board of APR Energy.

216.     While Church was working for both companies simultaneously, he: (1) accessed APR Energy's confidential and proprietary information, (2) took a salary and benefits from APR Energy, and (3) made fraudulent charges to APR Energy.

217.     APR Energy has been damaged by the aiding and abetting of the breaches of Church's fiduciary duties in the amount of Church's salary and benefits APR Energy paid to him as the Chief Executive Officer and board member of APR Energy, while he was simultaneously working for the American Power Entities and advancing their interests, to APR Energy's detriment.

218.     The American Power Entities' substantial assistance and encouragement of Church's violations of his breaches of fiduciary duty were a direct cause of the damages that APR Energy sustained.

WHEREFORE, APR Energy requests judgment in its favor and against the American Power Entities for damages, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## COUNT VII

## FRAUDULENT MISREPRESENTATION

### APR Energy Against Defendant Church

219.     APR Energy realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 132.

220.     As the Chief Executive Officer and board member of APR Energy, Church had a corporate credit card, to which he was only authorized to charge expenses that were directly related to APR Energy's official business.

221.     APR Energy covered expenses that Church charged to APR Energy's credit card because of Church's representation that those charges were related to APR Energy's official business.

222.     Church lied. Church repeatedly mischaracterized these expenses as related to APR Energy's official business when he knew that they were not. He also knew that his mischaracterizations were material because APR Energy would refuse to cover charges that were not related to its business.

223.     Church's lies and misrepresentations about the nature of his charges were intentional. He made his misrepresentations with the intent of inducing APR Energy to act upon them by covering his illegitimate charges.  APR Energy paid for these charges because Church led APR Energy to believe that they were for legitimate corporate purposes.

224.     Incorporated as **Exhibit L**, *see* [DE 01-14], is a chart that provides: (1) each illegitimate expense that Church charged to the corporate credit card; (2) the nature or type of expense; (3) the merchant or seller associated with the expense; (4) the date on which Church charged the expense to the corporate credit card; and (5) the amount of each charge.

225.     APR Energy has been damaged by Church's false misrepresentations because it expended money to cover Church's illegitimate expenses, in reliance on Church's false representations.

WHEREFORE, APR Energy requests judgment in its favor and against Church for damages, costs, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## COUNT VIII

## UNJUST ENRICHMENT

### APR Energy Against Defendant Church

226.    APR Energy realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 132.

227.    As the Chief Executive Officer and board member of APR Energy, Church had a corporate credit card, to which he was only authorized to charge expenses that were directly related to APR Energy's official business.

228.    APR Energy covered expenses that Church charged to APR Energy's credit card because of Church's representation that those charges were related to APR Energy's official business.

229.    Church lied. Church repeatedly mischaracterized these expenses as related to official APR Energy business when he knew that they were not. He also knew that his mischaracterizations were material because APR Energy would refuse to cover expenses that were not related to APR Energy's business.

230.    Church's lies and misrepresentations about the nature of his charges were intentional.  He made his misrepresentations with the intent of inducing APR Energy to act upon them by covering his illegitimate charges. APR Energy paid for these charges because Church led APR Energy to believe that they were for legitimate corporate purposes. By covering Church's illegitimate expenses, APR Energy conferred a benefit on Church. Church has knowledge of this benefit.

231.   Church voluntarily accepted APR Energy's covering of his corporate credit card charges and retained and continues to retain the funds that he otherwise would have expended had he paid for his personal, non-corporate expenses himself.

232.   Incorporated as **Exhibit L**, *see* [DE 01-14], is a chart that provides: (1) each illegitimate expense that Church charged to the corporate credit card; (2) the nature or type of expense; (3) the merchant or seller associated with the expense; (4) the date on which Church charged the expense to the corporate credit card; and (5) the amount for each specific charge or expense.

233.   APR Energy has been damaged because it expended money to cover Church's illegitimate charges, in reliance on Church's false representations.

234.   Under these circumstances, it would be inequitable for Church to retain the value of his false charges to APR Energy's credit card without paying that value back to APR Energy.

235.   As the Chief Executive Officer of APR Energy, Church also received a salary and benefits for devoting his time and energies on behalf of APR Energy.

236.   Church, however, lied regarding how he was using his time and on whose behalf he was working. Church's employment as APR Energy's CEO overlapped with his employment at the American Power Entities from no later than early November 2023, when the American Power Entities hired Church, to January 23, 2024, the date that APR Energy fired him. During that time period, rather than devote his time to APR Energy, Church split his time between APR Energy and its competitor.

237.   During his time working for both APR Energy and the American Power Entities, Church misrepresented the nature of his work to APR Energy, which believed that Church was acting as its Chief Executive Officer, and not as a double-agent.

238.    Church's misrepresentations and clandestine double-dealing unjustly enriched him. He collected a salary and benefits from APR Energy despite spending much of his time not working for APR Energy, but for a competitor. He made his material misrepresentations with the intention of inducing APR Energy to continue paying him, which it did until it discovered that Church was being simultaneously employed by the American Power Entities.

239.    Under these circumstances, it would be inequitable for Church to retain either the value of his salary and benefits during the period of his double-dealing or the portion of his salary commensurate with the time he spent working during that period for the American Power Entities.

WHEREFORE, APR Energy requests judgment in its favor and against Church for damages, costs, pre-judgment and post-judgment interest, costs, and any further relief that this Court deems just and proper.

## <u>VERIFICATION BY PLAINTIFF[1]</u>

Under penalty of perjury, I declare that I have read the foregoing Verified Amended Complaint and the facts alleged therein are true and correct to the best of my knowledge and belief.

Dated this 6th day of June 2025.

Signed by:

Joseph DiCamillo

126AD3559B1747D...

Joseph DiCamillo
General Counsel, New APR Energy, LLC

---

[1]    The proposed Amended Complaint had Joseph DiCamillo verifying the Amended Complaint on behalf of Plaintiffs as the General Counsel of APR Energy, LLC. *See* [DE 118-1] at p. 54. In the interim, Mr. DiCamillo discontinued this role with APR Energy, LLC. As of the date of filing, Mr. DiCamillo is the General Counsel of New APR Energy, LLC. Owing to this change, Plaintiffs amend the verification section above to reflect Mr. DiCamillo's current role as General Counsel for New APR Energy, LLC, and his verification of the Amended Complaint on behalf of New APR Energy, LLC.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated this 6th day of June 2025.

                                                  Respectfully submitted,

                                                  **NELSON MULLINS**
                                                  *Counsel for Plaintiffs*

                                                  */s/Mark F. Raymond*
                                                  **Mark F. Raymond** | Fla. Bar No. 373397
                                                  mark.raymond@nelsonmullins.com
                                                  **Ryan K. Todd** | Fla. Bar No. 91679
                                                  2 S. Biscayne Blvd.
                                                  One Biscayne Tower, 21st Floor
                                                  Miami, Florida 33131
                                                  Telephone No. 305.373.9425
                                                  Facsimile No. 305.373.9443

                                                  **Craig N. Killen**
                                                  *PHV Admitted*
                                                  North Carolina Bar No. 43980
                                                  craig.killen@nelsonmullins.com
                                                  One Wells Fargo Center
                                                  301 South College Street, 23rd Floor
                                                  Charlotte, NC 28202
                                                  Telephone No. 704.417.3127
                                                  Facsimile No. 704.377.4814